UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| DAY ISLAND YACHT CLUB, | NO. |
| Plaintiff, | COMPLAINT |
| v. | |
| CITY OF UNIVERSITY PLACE, | |
| Defendant. | |

## I.   INTRODUCTION

1.      This is a citizen suit brought under the Clean Water Act ("CWA"), 33 U.S.C. § 1365. Plaintiff Day Island Yacht Club seeks a declaratory judgment, injunctive relief, and the imposition of civil penalties, as well as an award of costs, including attorney and expert witness fees, against Defendant City of University Place. The action is to address the Defendant City's repeated and ongoing failure to maintain a sediment detention pond that is a known feature of the City's stormwater system, and, thereby, allowing silt-laden City surface water to discharge to saltwater tidelands owned by Plaintiff and, thereafter, the Puget Sound. This failure violates the terms and conditions of the City's coverage as a permittee under the Western Washington National Pollution Discharge Elimination

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

System ("NPDES") Phase II Municipal Stormwater Permit, which permit authorizes discharges, pursuant to conditions, from the City's drainage system to navigable waters of the United States, and, thus, violates §§ 1311(a) and 1342 of the CWA.

## II.    JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction pursuant to 33 U.S.C. § 1365(a). The relief requested herein is authorized by 33 U.S.C. §§ 1319(d) and 1365(a).

3.     Pursuant to 33 U.S.C. § 1365(b)(1)(A), Plaintiff Day Island Yacht Club notified the Defendant City of its violations of the CWA and of Plaintiff's intent to sue under the CWA by letter, attached as **Exhibit 1**, that was sent via email and certified mail on  August 9, 2022 ("Notice Letter"). The allegations in the Notice Letter are incorporated herein. Plaintiff notified the City's Mayor, the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region 10, and the Director of the Washington Department of Ecology ("Ecology") of its intent to sue Defendant by emailing and mailing copies of the Notice Letter on August 9, 2022.

4.     More than 60 days have passed since the notice was served and Defendant remains in violation of its NPDES permit and the CWA. The violations complained of in the Notice Letter are continuing or reasonably likely to continue. Neither EPA nor Ecology has commenced any action constituting diligent prosecution to redress these violations.

5.     The source of the violations is located in Pierce County, Washington, within the Western District of Washington, and venue is therefore appropriate in the Western District of Washington pursuant to 33 U.S.C. § 1365(c)(1).

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

### III.    PARTIES AND STANDING

6.    <u>Defendant City of University Place</u> is a municipal corporation formed under the laws of the State of Washington.

a.    The City established a storm drainage and surface water management utility through which it operates and controls the storm drainage and surface water management within the City.

b.    The Defendant City is a permittee under the Western Washington NPDES Phase II Municipal Stormwater Permit ("Permit"). The City is a regulated small Municipal Storm Sewer System (MS4) under the Permit (Permit #WAR045021).

7.    <u>Plaintiff Day Island Yacht Club</u> ("Yacht Club") is a duly formed Washington nonprofit corporation that has paid all fees owing to the State of Washington.

a.    The Yacht Club is comprised of approximately 375 members. The Yacht Club assists its members in safe, fun, and family-oriented boating, and provides facilities for docking, and moorage for member's boats.

b.    The Yacht Club owns improved real property located at 2120 91st Avenue West in University Place, Washington (Tax Parcel No. 0220092007). The Yacht Club also owns the abutting saltwater tidelands located in the Day Island Lagoon, which is a body of water located east of Day Island and is connected to Puget Sound through a narrow inlet at the north end of Day Island. Plaintiff's tidelands are identified as Tax Parcel Nos. 8950003660, 3425001072, 3430000230, and 3430200300 ("Yacht Club Tidelands"), and are improved with a 108-slip marina utilized by Yacht Club members for moorage.

c.    The City's published Stormwater Map and Watershed and Outfall Inventory inform that surface water for the City of University Place is divided into 12 drainage

COMPLAINT - 3 of 25
()
[4879-8447-6016]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

basins; and all the City's surface water eventually drains into Puget Sound. Included in the City's drainage basins is the Day Island Waterway Basin, which encompasses approximately 480 acres and drains as described in the Watershed and Outfall Inventory:

> The Day Island Waterway watershed all drains northward by storm sewers, culverts and detention ponds to 24-inch storm sewer along 27th Street West. This storm sewer becomes 36 inches in diameter at the lower portion of the basin towards the northwest and parallels the north side of Day Island Bridge Road and discharges into the Puget Sound through a pair of 36-inch culverts underneath the railroad tracks. A small portion of the basin on the south side of Day Island Bridge Road drains to Puget Sound through a natural creek.

d.    The Day Island Waterway Basin drains directly into the Yacht Club Tidelands where its marina is located. The cover page for the City's published Storm Water Map prominently depicts the Yacht Club Tidelands and marina that receive the City's collected stormwater. The Yacht Club Tidelands and marina are situated on the lower left quadrant of the map cover page below and just right of the Day Island Bridge.



LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

8.      The Yacht Club, as an impacted property owner, has individual standing, and, as a membership organization, has both organizational and representational standing. The Yacht Club and its individual members are reasonably concerned about the effects of Defendant's discharge of pollutants, including sediments, to navigable waters of the United States, including specifically to the Yacht Club Tidelands in the Day Island Lagoon. The Defendant's discharges adversely affect enjoyment of the Yacht Club Tidelands, including interference with moorage at and use of the Yacht Club marina, boat navigation within the Yacht Club Tidelands and safe use of the pedestrian floating walkway. The recreational, economic, aesthetic, and/or health interests of Yacht Club and its members have been, are being, and will be adversely affected by Defendant's violations of the CWA. The relief sought in this lawsuit can redress the injuries to these interests.

IV.      FACTUAL AND LEGAL BACKGROUND

9.      Defendant City of University Place became incorporated as a municipal corporation in August 1995. Prior to that time, University Place was served and benefitted by certain Pierce County government services and certain City of Tacoma government services, including stormwater management facilities.

10.     On August 28, 1995, the City Council adopted Ordinance No. 57, which established a storm drainage and surface water management utility to provide for the future operation and control of storm drainage and surface water management within the City. Thereafter, the City assumed control and responsibility over and operation of certain City of Tacoma and Pierce County stormwater facilities that, following incorporation, laid within the City of University Place or became necessarily a part of the drainage system

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

supporting the newly incorporated City. Through Ordinance 57, the City also established a surface water management fund, and authorized receipt and collection of fees from its citizenry to operate and maintain the storm water facilities (adopting the Pierce County rates).

**The Day Island Bridge Pond And The City's Modifications To Improve Sediment Detention**

11.     Included in the stormwater facilities over which the City assumed control, operation and responsibility is a detention/sediment pond situated just northwest of where Day Island Bridge Road West travels over Lemon Beach Road West ("Day Island Bridge Pond"). The Day Island Bridge Pond receives large quantities of stormwater collected from a vast area within the University Place stormwater drainage system (the 480-acres Day Island Waterway Basin). As noted earlier, this basin drains northward by storm sewers, culverts, and detention ponds to a 24-inch storm sewer along 27th Street West. This storm sewer becomes 36 inches in diameter at the lower portion of the basin towards the northwest and parallels the north side of Day Island Bridge Road and discharges into the Puget Sound through a pair of 36-inch culverts underneath the railroad tracks.

12.     The Day Island Bridge Pond is between the 36-inch storm sewer and the twin culverts under the railroad. More specifically, the Day Island Bridge Pond receives water from the storm sewer, drains under a pond embankment berm through another approximately 36" inch culvert, and then discharges through the two twin pipes that are located under the BNSF railroad tracks. It is thus an essential component of the City's public drainage system. These City stormwater facilities and their proximity to the Yacht Club Tidelands and marina are depicted on the following page.

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565



13.     The Day Island Bridge Pond, as well as its need for repair and ongoing maintenance, was acknowledged early in the City's incorporation. On August 17, 1998, the City adopted Ordinance 201, through which it adopted its first Comprehensive Storm Drainage Plan. The Comprehensive Storm Drainage Plan appended to Ordinance 201 was in draft form and dated August 13, 1998.

14.     Ordinance 201 expressly stated: "the City through this Comprehensive Storm Drainage Plan has identified problem areas requiring capital investments for storm drainage systems *to protect citizens and property*;" and ..."the City's storm drainage system *is in need of on-going maintenance to assure the reliability of the drainage*

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

*system*, to extend its useful life, and to enhance their performance in conveying and treating flows." (Emphasis added.) The adopted Storm Drainage Plan, which the City acknowledged as "an official regulation of the City," specifically identified the Day Island Bridge Pond as part of the system and in need of repair to address sediment build up.

15.     The purpose of this Comprehensive Storm Drainage Plan was stated in chapter 1 of the Plan:

> Since its incorporation, the City of University Place has assumed the responsibility for surface and stormwater management within the City's boundaries. There currently exist a number of stormwater-related problems within the City. Unless proper surface water management strategies are implemented, continued development will increase pressures on the drainage infrastructure and receiving waters, and opportunities to cost effectively correct existing problems may be lost. To develop such strategies, the city of University Place authorized Earth Tech to conduct studies of the City's surface and stormwater systems and prepare a Surface Water Plan.

16.     Toward the above-stated objective, the Plan included a Capital Improvement Program to address "a number of problems in the City's drainage infrastructure" and recommended specific improvements. Among the "problems" identified was the Day Island Bridge Pond. More specifically, the Plan identified a need to reconfigure and repair this Pond to address sediment build up, as well as the need to provide ongoing pond maintenance, including ongoing sediment removal. The project was identified in the Plan as Project 11 and is described at page 6-4:

> The pond known as the 'Day Island Bridge' pond is located immediately east of the railroad tracks and north of the Day Island Bridge Road. This pond was historically the responsibility of the City of Tacoma [prior to the City's incorporation]. The pond discharge is tidally influenced as evidenced by marine growth around the inlet of the twin discharge pipes. *With more frequent cleaning, the pond's sediment removal efficiency can be enhanced. This will require improvement of access road into the pond to facilitate regular maintenance.*

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

*The pond should also be reconfigured to improve sediment removal and concentrate sediment deposition within in a smaller area in the facility, thereby enhancing discharge quality and maintenance efficiency. The pond should be excavated to remove accumulated sediments and create multiple cells to promote sedimentation.* (Emphasis added.)

17.     Notably, the Day Island Bridge Pond was a subject of state court litigation; and the City became a party to that litigation shortly after it incorporated in 1995. The trial court in that action expressly found that the City "assumed jurisdiction and control, legally and factually, over the storm sewer system within the boundaries of the City of University Place."[1] This storm sewer system included the Day Island Bridge Pond. The litigation put the City on notice that, with incorporation, the City assumed a duty to maintain the Day Island Bridge Pond along with its other stormwater management facilities.

18.     The City expressly acknowledged this lawsuit and the need to improve and maintain the transferred stormwater facilities through Ordinance No. 202, which was also adopted on August 17, 1998 – the same day the City adopted the Comprehensive Stormwater Drainage Plan. The City stated in the recitals to Ordinance No. 202:

Whereas, shortly after incorporation the City was joined to a lawsuit alleging damages for trespass and inverse condemnation arising out of surface and storm water management facilities which had been built by and owned by Pierce County prior to incorporation but which were transferred to the ownership of the City upon incorporation.

Due to this fact and others, the City declared in the recitals: "the City's storm drainage and surface water management utility needs to accumulate additional reserves to pay for necessary system improvements identified in the City's Comp Storm Drainage Plan."

---

[1] *Day Island Yacht Club v. Pierce County, City of Tacoma and City of University Place,* Pierce County cause no. 90-2-00308-1, (Order Denying and Partially Granting Motion for Summary Judgment dated December 6, 1996). These state law claims, which did not assert any CWA claims, were resolved in 1997 through an accepted Offer of Judgement.

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

Based on these recitals, the City increased the storm drainage and surface water management fees charged to its citizenry "to better reflect the costs of the facilities which the City needs to build to improve water quality."

19.     The Comprehensive Storm Drainage Plan was finalized in August 1999. All the language quoted above from the draft Plan dated August 13, 1998 remained the same in the final Plan, except, in the final Plan, Project 11 was labeled as "Retrofit Day Island Bridge Pond." Records obtained from the City through Public Records Act requests reveal that Project 11 to Retrofit the Day Island Bridge Pond was advanced and completed.

20.     On or around July 16, 1999, the City Manager accepted and signed a design proposal contract with consulting engineers Gray & Osborne, Inc. Gray & Osborn referred to the project as: "Stormwater Project – 27th Street Detention Pond," presumably because the detention pond received water from the 24-inch storm sewer that runs along 27th Street West before it becomes 36 inches in diameter at the lower portion of the basin towards the northwest and then parallels the north side of Day Island Bridge Road. The accepted contract described the design project as follows:

> The 27th Street pond will be divided into two cells to enhance water quality in regards to creating a sedimentary trap. Additionally, the pond will be mapped in regards to its existing physical limits, edge of vegetation,  access, fence pipe and structure locations, inlet and outlet pipe elevations, pipe sizes mapped beneath railroad tracks, pond elevation 'soundings', and pond size (storage capacity) calculated. Installation of small, 'low flow' by-pass pipe beneath berm area (between cells) will be provided.

The accepted contract also stated that the bid "assumes City will do construction."

21.     In or around October 1999, Gray & Osborne prepared and provided the City draft 27th Street West Detention Pond Repair Design Drawings ("Gray & Osborne Repair

COMPLAINT - 10 of 25
()
[4879-8447-6016]

Plans"). The Gray & Osborne Repair Plans include details of the original pond design, including pond bottom elevations, inlet and outlet pipe inverts. The repair designs included construction of a berm within the northern end of the pond that would facilitate pond maintenance by dividing the pond into two cells, creating a forebay to promote settlement of solids and prevent tidal backflow into the pond. The Gray & Osborn Repair Plans called for excavation of soil and sediment to a depth 2 feet below the invert of the 36" concrete outlet pipe (upstream of the twin concrete culverts that discharge into the Day Island Tidelands). On information and belief, the purpose of this 2-foot sump was to reduce the velocity of stormwater flows from the 27th Street West storm sewer and allow for sediment to settle before discharging out of the pond and into the lagoon.

22.     In or around October 1999, the U.S. government promulgated Federal NPDES Phase II Rules, which, for the first time, subjected the City to NPDES permit coverage requirements. Prior to that time, NPDES permit coverage (Phase I NPDES Permit) was limited to municipalities with a population of 100,000 or greater.

23.     On November 15, 1999, the City adopted Ordinance No. 256, which again adjusted the storm drainage and surface water management fees "to reflect the costs of the facilities which the City needs to build to improve water quality." In this Ordinance, the City expressly acknowledged "adoption of Phase II of the National Pollution Discharge Elimination System rules which mandate stormwater improvements for the City."

24.     In or around August 2000, Gary Cooper, the City's then Public Works Superintendent, signed and submitted to the City's Department of Planning and Community Development ("Planning Department") a land use application, shoreline

COMPLAINT - 11 of 25
()
[4879-8447-6016]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

substantial development permit application and a State Environmental Policy ("SEPA") Checklist to obtain authorization to repair and modify the Day Island Bridge Pond.

25.     In the SEPA Checklist, the Public Works Superintendent described the proposal: "Maintenance and improvements of regional stormwater detention facility, including 135 tons of fill and addition of backflow control devices on drain culverts." He represented the then current conditions of the site as:

> Large pond area which collects sediments and distributes storm water from the northern region of the City. The area is also tide influenced by two 32" culverts which drain into Puget Sound.

When asked to identify any surface water body on or in the immediate vicinity (including seasonal streams and wetlands), the Public Works Superintendent represented:

> 36" Culvert which drains storm water from the northern region of the City to the pond area that collects sediment, which is presently full, to twin 36" culvert pipes under the railroad tracks and out to the Puget Sound.

He did not identify any  streams or wetlands.

26.     The Public Works Superintendent explained in the SEPA Checklist that the proposal would create "detention/settlement cells and maintenance access." The project also included installation of two one-way back-flow doors, also referred to as tidal gates, on the twin drainage pipes that run underneath the railroad tracks to eliminate tidal influence from Puget Sound on the detention pond.

27.     In the land use application, the Public Works Superintendent represented that the proposed work in the pond would "allow area for silts to settle before water discharges to Puget Sound." For a more detailed description of the proposed project, the Public Works Superintendent submitted and referenced in the SEPA Checklist the Gray & Osborne Repair Plans.

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

28.    On or around September 6, 2000, the City's SEPA Responsible Official issued a Mitigated Determination of NonSignificance ("MDNS"). The MDNS, which also described the project as "maintenance and improvements of regional stormwater detention facility," was sent out to local and state agencies for comment, including Ecology. Notice of the project application and the MDNS was also sent to the Yacht Club as a property owner within in 300 feet of the project site.

29.    On or around October 30, 2000, Ecology provided a SEPA comment letter on the City's proposal for "maintenance and improvements of the regional stormwater detention facility." Ecology did not express any material concerns regarding the project. Ecology did advise the City that it should contact the U.S. Army Corps of Engineers to determine if the Army Corps has additional permit requirements for the project.

30.    The shoreline substantial development permit ("SSDP") that the City requested for its pond repair project required approval by the City's Hearing Examiner. On or around April 3, 2001, the City's Planning Department issued a Staff Report with recommendations to the City's Hearing Examiner. Planning Department staff, based on representations made by the City's Public Works Superintendent and other review, represented to the Examiner: "The proposed work is designed to improve water quality by removing silt and sediment from water before it is discharged to Puget Sound." The Staff Report attached (as Exhibit C) the Gray& Osborne Repair Plans, representing that those drawings were the "Site Plan and Associated Details" for the project.

31.    On or around April 13, 2001, City Hearing Examiner Stephen Causseaux, Jr. approved the requested SSDP and authorized the repairs. The Examiner found that the pond is "a regional stormwater detention pond which collects sediments before

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

discharging storm water to Puget Sound." He also found that "[t]he storm drainage pond accommodates storm water flow from the north portions of the City." The Examiner described the proposed project, which he ultimately approved and authorized, as follows:

> The Applicant is requesting a SSDP to allow regrading of an existing storm water detention pond and installation of rock spalls to create two siltation settlement cells. The application proposes removal of 250 cubic yards of siltation material. Applicant also proposes installation of two one-way back flow doors on the two 32" culverts that convey water from the pond to Puget Sound.

On behalf the City's Public Works Department, Mary Holloway appeared before the Examiner and "testified that they propose regrading the pond to create two separate sediment cells and that the water discharge to the Sound will be cleaner."

32.     As a condition of SSDP approval, the Examiner required the City to "comply with all permit requirements of state and federal agencies including Army Corps of Engineers." In or around April 2001, Ms. Holloway, on behalf of Public Works, contacted the Army Corps to inquire if any Army Corps permits are required before constructing the project. On information and belief, including an April 23, 2001 email between Holloway and City planner Isaac Conlen provided in response to Public Records Act requests to the City, the City represented to the Army Corps that the City was "making improvements to an existing facility to improve water quality." Based upon this same April 23, 2001 email it is believed that the Holloway emphasized to the Army Corps that "[t]he improvements are occurring within the existing storm pond, the pond is located shoreward of the ordinary high water mark and the goal is to improve water quality."

33.     By email dated April 26, 2001, Holloway reported to Conlen: "No permit required. Army Corps does not regulate artificial water ponds unless they have been abandoned and will be reactivated." By letter dated May 14, 2021, the City forwarded to

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

Ecology the Hearing Examiner's April 13, 2001 decision approving the SSDP, along with the City's Staff Report (with attachments, including the Gray & Osborne Repair Plans), the application materials and SEPA MDNS. In this letter, the City also represented to Ecology: "Army Corps of Engineers does not has indicated [sic] that a 404 permit is not required for this project."

34.     On information and belief, including information contained in City public records, the City constructed the pond improvements as planned and approved by the Examiner in late 2001 and/or early 2002. Invoices in the City records, including contracts/invoicing from Randles Sand & Gravel indicate approximately 425 tons of waste (roughly 265 cubic yards) were removed from the site, which is consistent with the plan and approval to remove 250 cubic yards of siltation material. Randles Sand & Gravel contracts/invoices also indicate delivery of 125 tons of rock, which is consistent with installation of the planned berm to divide the pond into two cells. Finally, construction photographs from the City's public records circa Fall 2001, and pond photos date stamped February 6, 2002, indicate that the City did, in fact, construct the project as depicted on the Gray & Osborne Repair Plans and described in the City's project application material.

35.     Unfortunately, based on City representations, the City failed to prepare as-built plans documenting the completed work or the storage capacity of the pond upon completion. The pond photographs date stamped February 6, 2002, as well as aerial photographs, however, provide evidence that the pond, following the City's improvements, had sufficient capacity to function as a sediment detention pond.

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

36.     The Gray & Osborne Repair Plans dictated 2 feet of dead storage, and, consistent with that design, a Randles Sand & Gravel contract was for the disposal of 265 cubic yards of waste material from the site. A construction photograph circa Fall 2001 from the City public records (photograph "a") depicts the elevation of the outfall during excavation of the pond. While an absolute measurement cannot be obtained from this photograph, it nonetheless reveals that a significant amount of sediment was excavated underneath the outfall. The presence of ponded water in pond photograph date stamped February 6, 2002 (photograph b) demonstrates that a sufficient amount of dead storage was available for the Pond to hold water between tidal cycles and act as a detention basin.



37.     An aerial image taken in 2001 or 2002, depicted with annotations below, shows a clear view of the pond features. The berm and access road near the pond are clear of vegetation. The pond's discharge culvert is readily visible. Significantly, the pond itself is full of water, indicating excavation was sufficient to create a functioning sump.

COMPLAINT - 16 of 25
()
[4879-8447-6016]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

The conditions depicted in the following aerial image further confirm that the features depicted in the Gray & Osborne Repair Plans were present post-construction.



38.    Recall that the Retrofit Day Island Bridge Project (Project 11) described in the City's first Comprehensive Storm Drainage Plan stated:

> The pond should also be reconfigured to improve sediment removal and concentrate sediment deposition within in a smaller area in the facility, thereby enhancing discharge quality and maintenance efficiency. The pond should be excavated to remove accumulated sediments and create multiple cells to promote sedimentation.

The Gray & Osborne Repair Plans presented a design consistent with the Retrofit Day Island Bridge Project and the photographs depicted above confirm that the retrofit construction in fact occurred. From the time the City incorporated, the Day Island Bridge Pond was a known feature of the City's regional stormwater facilities; and this was confirmed in the City's pond modification application materials in which the City referred to the pond as  a "regional stormwater detention facility." The City obtained permitting approval to repair and retrofit to this regional stormwater detention facility for the express purpose of creating a sedimentation pond that will improve water quality before City

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

stormwater is discharged to Puget Sound. As retrofitted, the Day Island Bridge Pond was the final BMP in removing the sediment load from the 480 acres of suburban runoff before it was discharged to the Yacht Club Tidelands in the Day Island Lagoon.

**The City's Failure To Maintain And The Current Condition Of The Day Island Bridge Pond**

39.     Recall that the City's first Comprehensive Storm Drainage Plan also stated regarding Project 11:

> With more frequent cleaning, the pond's sediment removal efficiency can be enhanced. This will require improvement of access road into the pond to facilitate regular maintenance.

Unfortunately, though the access road was constructed to facilitate the maintenance contemplated by the Plan, the City failed to carry out this cleaning and sediment removal necessary to maintain the intended sedimentation purpose of the Day Island Bridge Pond, which again, is a known feature of the City's stormwater management facilities and was constructed for the purpose of preventing discharge of silt-laden surface water.

40.     While the City installed the tidal gates, they became inoperable. The City did not repair or replace the tidal gates and, as a result, the tidal influence on the pond was not eliminated or reduced as the City planned. This unmitigated tidal influence reduced the effectiveness of the pond sump.

41.     The City also failed to remove sediment from the pond to maintain the necessary elevation for a functioning sump. In the absence of maintenance, the Day Island Bridge Pond has filled with sediment and debris such that the bottom of the pond is level with the outflow pipe and no longer serves its sedimentation function.

42.     Without adequate detention time for sediments and debris to settle out of the stormwater into the detention pond, suspended sediments in the incoming City

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

stormwater are instead transported to the Yacht Club Tidelands. The Yacht Club has observed a substantial increase in sediment buildup in its tidelands in the area where the City's stormwater discharges, particularly in more recent years. The problem is significant. Notably, after the Yacht Club last dredged the lagoon in the late 1990s, there was approximately 6 feet of water at the pier and around the boat slips at zero tide. Today, even though the Yacht Club has done interim maintenance dredging, there is no longer any water depth at zero tide. Review of available soundings for these tidelands to confirm a relationship between sediment buildup in in the Day Island Bridge Pond and the sediment buildup in Yacht Club Tidelands since the soundings indicate the buildup in the tidelands has predominantly occurred in more recent years as the pond has filled.

43.     Sediment has accumulated to such an extent in the Yacht Club tidelands that it is impacting the positioning of the floating marina dock at an average lower low tide. Due to this sediment buildup, It is now difficult to navigate boats around the marina and moor boats at the marina.

<u>Violations Of the Clean Water Act</u>

44.     The Clean Water Act makes it unlawful for anyone, including municipalities, to discharge a pollutant into navigable waters except as authorized by specific sections of the Act. 33 U.S.C. § 1311(a) and § 1342. The definition of "pollutant" is broad and includes sediment. 33 U.S.C. § 1362(6); 40 C.F.R. § 122.2; *Driscoll v. Adams,* 181 F,3d 1285, 1291 (11th Cir. 1999). Of course, the principal method of regulating such discharges is the National Pollutant Discharge Elimination System ("NPDES") permitting process. 33 U.S.C. § 1342.

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

45.     Beginning in January 2007, the City was granted coverage for discharges of its collected stormwater under the NPDES Western Washington Phase II Municipal Stormwater permit. The Permit, as originally issued and extended, obligates the City to repair and maintain the Day Island Bridge Pond, which is a known feature of the City's larger stormwater management facilities.

46.     Section S4 of the Permit – Compliance with Standards – requires:

A. In accordance with RCW 90.48.520, the discharge of toxicants to waters of the state of Washington  which would violate any water quality standards, including toxicant standards, sediment criteria and dilution zone criteria is prohibited. ...

B. The Permit does not authorize a discharge in violation of Washington State Surface Water Quality Standards (chapter 193-201A WAC), Ground Water Quality Standards (chapter 193-200 WAC), Sediment Management Standards (chapter 193-204 WAC), or human health-based criteria in national Toxics Rule (Federal Register, Vol. 57, NO. 246, Dec. 22, 1992, pages 60848-60923). ...

C. The Permittee shall reduce the discharge of pollutants to the maximum extent practicable (MEP).

D.  The Permittee shall use all known, available, and reasonable methods to prevent and control pollution of waters of the State of Washington. (Also known as "AKART")

47.     Section S5 of the Permit – Stormwater Management Program (SWMP) – requires the City to adopt and implement a Stormwater Management Program. The City's Phase II NPDES Stormwater Management Program sets for the City's Municipal Operations and Maintenance Program at Section 7, which includes maintenance standards for the City's drainage facilities as identified in Appendix B.[2] This SWMP specifically sets maintenance standards for detention ponds within the City's drainage

---

[2] The maintenance standards set forth in Appendix B are from the King County Storm Water Design Manual, which standards were initially adopted by City Ordinance No. 142.

COMPLAINT - 20 of 25
()
[4879-8447-6016]

system. Relevant to this matter, the SWMP provides that maintenance is required if accumulated sediment exceeds 10% of the designed pond depth. In such case, the Program requires that sediment be cleaned out to designed pond shape and depth and that the pond be reseeded as necessary to control erosion.

48.     There can be no dispute that the sediment accumulated in the Day Island Bridge Pond exceeds 10% of the designed pond depth. Yet, the City has openly admitted that, for years, it has not performed any maintenance of the Day Island Bridge Pond beyond clearing of vegetation, much less sediment removal mandated by the SWMP adopted pursuant to the NPDES mandate. As a result, the Day Island Bridge Pond has filled with sediment and debris such that the bottom of the pond is level with the outflow pipe and no longer serves its function as a sedimentation pond.

49.     In failing to remove the substantial sediment accumulation in the Day Island Bridge Pond, the City has not only failed to comply with a discrete and specific detention pond maintenance standard in the SWMP, but it has also failed to apply AKART to the City's discharges into the Day Island Lagoon. The result is increased sediment flow into the Day Island Lagoon, thereby violating the Permit mandate to reduce the discharge of pollutants – sediments -  to the maximum extent practicable.

50.     The City has violated and continues to violate the terms and conditions of the SWMP and the Permit, including Section S4(A)-(D) and S5, and, thus, has violated the CWA, specifically 33 U.S.C. § 1311(a) and 33 USC § 1342.

**CWA Notice Letter And This City's Continued Refusal To Bring The Pond Into Compliance**

51.     DIYC has repeatedly brought the matter to the City's attention and requested action. On May 19, 2021, for example, DIYC representatives, along with their

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

engineering consultants, met Public Works Director Gary Cooper, Engineering Director Jack Ecklund and NPDES Coordinator Todd Smith at the Day Island Bridge Pond site. Unfortunately, the City was unwilling to address the unmaintained Day Island Bridge Pond.

52.     At that time, the City acknowledged that the City Stormwater System maps confirm that the Day Island Bridge Pond is tributary to the City's drainage system. Despite this fact, the City nonetheless refused to acknowledge the Day Island Bridge Pond as a part of the City's drainage system for which the City is required to provide maintenance. The City's stated position at that time was that, since the City found no record of design drawings or engineering for the initial construction of this stormwater detention pond, there are no design-based maintenance requirements. The City informed Yacht Club that, while it apparently accepts responsibility for inspecting the Day Island Bridge Pond annually and before forecasted rain events; the City feels it has no obligation to remove accumulated sediment from the Pond.

53.     The City provided the Yacht Club with the Gray & Osborne Repair Drawings, but has asserted that Plans were conceptual and that the City took no action to construct the depicted repairs other than build the maintenance road. Though Mr. Cooper attended the May 19, 2021 meeting, he did not disclose the subsequent permitting activity and construction, even though he  signed and was the apparent author of the permitting applications and SEPA Checklist that led to approval of the pond retrofit project.

54.     By letter dated March 4, 2022 from the Yacht Club's counsel, the Yacht Club again asked the City to repair and maintain the Day Island Bridge Pond to address the sediment buildup. The City again failed to act and by letter from the City Attorney

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

dated May 12, 2022, the City again refused to accept responsibility for repairing and maintaining the Day Island Bridge Pond.

55.     By letter dated August 9, 2022 from the Yacht Club's counsel, the Yacht Club provided notice of intent to sue under the CWA, which is the Notice Letter attached as Exhibit 1.

56.     Since the Notice Letter, the City has continued to refuse to repair and maintain the Day Island Bridge Pond, thus negating the pond's sedimentation purpose.

57.     The City's violations of the CWA not only adversely impacted the Yacht Club Tidelands, but also degraded the environment generally and the water quality of the Larger Day Island Lagoon and Puget Sound. These impacts were avoidable had the City diligently managed and maintained the Day Island Bridge Pond, which maintenance was affirmatively acknowledged as necessary in the City's first Comprehensive Drainage Plan, acknowledged as necessary to improve water quality in the City's permit application submittals, and required by the City's NPDES Permit.

## V.     CAUSE OF ACTION

58.     The preceding paragraphs and the allegations in the Notice Letter attached as Exhibit 1 are incorporated herein.

59.     Defendant's violations described here in and in the Notice Letter constitutes violations of the terms and conditions of the SWMP and the Permit, including Section S4(A)-(D) and S5, and, thus, violates the CWA, specifically 33 U.S.C. § 1311(a) and 33 USC § 1342.

60.     On information and belief, the violations committed by Defendant are ongoing or are reasonably likely to continue to occur. Any and all additional violations of

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

the CWA which occur after those described in the Yacht Club's Notice Letter but before the final decision in this action should be considered continuing violations subject to this Complaint.

61.    Without imposition of appropriate civil penalties and the issuance of an injunction, Defendant will likely continue to violate the CWA to the further injury of the Yacht Club, its members, and others.

62.    A copy of the Complaint is being served on the Attorney General of the United States and Administrator of the U.S. Environmental Protection Agency as required by 33 U.S.C. § 1365(c)(3).

## VI.    RELIEF REQUESTED

Wherefore, Plaintiff Day Island Yacht Club requests that this Court grant the following relief:

A.    Issue a declaratory judgment that Defendant City of University Place has violated and continues to violate the CWA, specifically 33 U.S.C. § 1311(a) and 33 USC § 1342;

B.    Enjoin Defendant from operating their storm water facilities in a manner that results in further violation of 33 U.S.C. § 1311;

C.    Order Defendant to immediately take corrective action to remove sediment accumulation from, repair or as necessary modify the Day Island Bridge Pond, and to thereafter continue maintenance of the Day Island Bridge Pond  such that it functionally operates consistent with its purpose, which is sediment detention to improve water quality of the receiving Day Island Lagoon;

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

D.      Order Defendant to take specific actions to remediate the environmental harm caused by their violations;

E.      Order Defendant to allow Plaintiff to participate in the development and implementation of a plan for remediation of the Yacht Club Tidelands;

F.      Order Defendant to pay civil penalties of $59,974 per day of violation for each violation committed by Defendant pursuant to 33 U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. § 19;

G.      Award Plaintiff their litigation expenses, including reasonable attorneys' and expert witness fees, as authorized by 33 U.S.C. § 1365(d); and

H.      Award such other relief as the Court deems appropriate.

Dated this 20th day of July, 2023.

GORDON THOMAS HONEYWELL LLP

By _____
Margaret Y. Archer, WSBA No. 21224
marcher@gth-law.com
Attorneys for Plaintiff Day Island Yacht Club

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

EXHIBIT 1



GORDON THOMAS HONEYWELL LLP

Margaret Y. Archer
Direct: (253) 620-6550
E-mail: marcher@gth-law.com

August 9, 2022

*Via certified mail, return receipt requested*

Mayor Steve Worthington
City of University Place
3609 Market Place West, Suite 200
University Place, WA  98466

Jack Ecklund
Director, Engineering & Capital Projects
Interim Director, Public Works, Parks & Facilities
City of University Place
3609 Market Place West, Suite 200
University Place, WA  98466

RE:     NOTICE OF INTENT TO SUE UNDER THE CLEAN WATER ACT

Dear Mayor Worthington and Mr. Ecklund:

I represent the Day Island Yacht Club ("DIYC"), which is a Washington State nonprofit corporation located in the City of University Place at 2120 91st Avenue West (253 565-3777). DIYC owns its tidelands, upon which tidelands it operates a 108-slip permanent moorage marina for its members. This letter is to provide you with sixty days' notice of DIYC's intent to file a citizen suit against the City of University Place (the "City") under section 505 of the Clean Water Act ("CWA"), 33 U.S.C. § 1365, for the violations described below. The violations result in increased silt laden stormwater that  flows into the marina and interferes with vessel mooring and safe use of the pedestrian floating walkway. Any response or correspondence related to this matter should be directed to me at the address provided on the letterhead.

BACKGROUND

<u>The Day Island Bridge Pond</u>

This Notice involves and arises from the City's failure to adequately maintain the detention/sediment pond that is located on City property (parcel number 8950003680) and

Reply to:
Tacoma Office
1201 Pacific Ave., Suite 2100     (253) 620-6500
Tacoma, WA 98402                 (253) 620-6565 (fax)

Seattle Office
520 Pike St, Suite 2350     (206) 676-7500
Seattle, WA 98101           (206) 676-7575 (fax)

[4880-1988-0236]
EXHIBIT 1 .1

Law Offices | www.gth-law.com

Gordon Thomas Honeywell LLP
August 9, 2022
Page 2

is situated just northwest of where Day Island Bridge Road West travels over Lemon Beach Road West ("Day Island Bridge Pond"). The Day Island Bridge Pond receives large quantities of stormwater collected from a vast area within the University Place stormwater drainage system. It is thus an essential component of the City's public drainage system. Relevant to DIYC's concern, the Day Island Bridge Pond drains under a pond embankment berm through an approximately 36" inch culvert, and then discharges into Day Island Yacht Club ("DIYC") tidelands at Day Island Lagoon through two twin pipes that are located under the BNSF railroad tracks. Notably, the cover page of the City of University Place Stormwater Map is an aerial photograph that prominently depicts the DIYC marina and tidelands that receive the City's collected stormwater.

The City has failed to maintain the Day Island Bridge Pond. The Pond, which is in a tidal zone, has filled with sediment and debris such that the bottom of the pond is level with the outflow pipe and no longer serves its function as a detention pond for substantial periods. As I am sure you are aware, without adequate detention time for sediments, debris and hazardous chemicals to settle out of the stormwater into the detention pond sediments, those substances are transported to the tidelands. DIYC has observed a substantial increase in sediment buildup up in its tidelands in the area where the City's stormwater discharges, particularly in more recent years. The problem is significant. Notably, after DIYC last dredged the lagoon in the late 1990s, there was approximately 6 feet of water at the pier and around the boat slips at zero tide. Today, even though DIYC has done interim maintenance dredging, there is no longer any water depth at zero tide. Review of available soundings for these tidelands appears to confirm a relationship between sediment buildup in in the Day Island Bridge Pond and the sediment buildup in DIYC tidelands, since the soundings indicate the buildup in the tidelands has predominantly occurred in more recent years as the Pond has filled.

<u>DIYC's Appeals to the City to Maintain the Day Island Bridge Pond</u>

DIYC has repeatedly brought the matter to the City's attention and requested action. On May 19, 2021, for example, DIYC representatives, along with their engineering consultants from Landau Associates, met Public Works Director Gary Cooper, Engineering Director Jack Ecklund and NPDES Coordinator Todd Smith at the Day Island Bridge Pond site. Unfortunately, the City was unwilling to address the unmaintained Day Island Bridge Pond.

The City acknowledged that the City Stormwater System maps confirm that the Day Island Bridge Pond is tributary to the City's drainage system. Despite this fact, the City nonetheless refused to acknowledge the Day Island Bridge Pond as a part of the City's drainage system for which the City is required to provide maintenance. The City's stated position at that time was that, since the City found no record of design drawings or engineering for the initial construction of this stormwater detention pond, there are no design based maintenance requirements. The City informed DIYC that, while it apparently accepts responsibility for

Gordon Thomas Honeywell LLP
August 9, 2022
Page 3

inspecting the Day Island Bridge Pond annually and before forecasted rain events; the City feels it has no obligation to remove accumulated sediment from the Pond.

Contrary to the City's then-stated position, substantial evidence confirms that the City has acknowledged responsibility for the Day Island Bridge Pond for decades and was long ago on notice of the clear need for ongoing maintenance to avoid the detrimental effects of sediment buildup.

To begin, the Day Island Bridge Pond, was the subject of state court litigation and the City became a party to that litigation shortly after it incorporated in 1995. Notably, the trial court in that action expressly found that the City "assumed jurisdiction and control, legally and factually, over the storm sewer system within the boundaries of the City of University Place."[1] This storm sewer system included the Day Island Bridge Pond. The earlier asserted state law claims, which did not assert against the newly incorporated City any claims based on failure to maintain the pond,[2] were resolved in 1997 through an accepted Offer of Judgement. But the litigation clearly put the City on notice that, with incorporation, the City assumed a duty to maintain the Day Island Bridge Pond along with its other stormwater management facilities.

Consistent with that understanding, the following year, the City adopted University Place Ordinance No. 201 on August 17, 1998. The Ordinance, entitled "An Ordinance of the City of University Place, Washington, adopting a Comprehensive Storm Drainage Plan," confirms that the City acknowledged and assumed responsibility for the Day Island Bridge Pond.

Ordinance 201 expressly stated: "the City through this Comprehensive Storm Drainage Plan has identified problem areas requiring capital investments for storm drainage systems *to protect citizens and property*," and …"the City's storm drainage system *is in need of on-going maintenance to assure the reliability of the drainage system*, to extend its useful life, and to enhance their performance in conveying and treating flows." The adopted Storm Drainage Plan, which the City acknowledged as "an official regulation of the City," specifically identified the Day Island Bridge Pond as part of the system and in need of repair to address sediment build up.

The purpose of the 1998 Storm Drainage Plan was stated in chapter 1 of the Plan:

---

[1] *Day Island Yacht Club v. Pierce County, City of Tacoma and City of University Place,* Pierce County cause no. 90-2-00308-1, (Order Denying and Partially Granting Motion for Summary Judgment dated December 6, 1996).

[2] The prior litigation also did not assert any claims under the CWA.

[4880-1988-0236]
EXHIBIT 1 .3

Gordon Thomas Honeywell LLP
August 9, 2022
Page 4

> Since its incorporation, the City of University Place has assumed the responsibility for surface and stormwater management within the City's boundaries. There currently exist a number of stormwater-related problems within the City. Unless proper surface water management strategies are implemented, continued development will increase pressures on the drainage infrastructure and receiving waters, and opportunities to cost effectively correct existing problems may be lost. To develop such strategies, the city of University Place authorized Earth Tech to conduct studies of the City's surface and stormwater systems and prepare a Surface Water Plan.

Toward the above-stated objective, the Plan included a Capital Improvement Program to address "a number of problems in the City's drainage infrastructure" and recommended specific improvements. Among the "problems" identified was the Day Island Bridge Pond. More specifically, the Plan identified a need to reconfigure and repair this Pond to address sediment build up, as well as the need to provide ongoing pond maintenance, including sediment removal. The project was identified in the Plan as Project 11 and is described at page 6-4:

> The pond known as the 'Day Island Bridge' pond is located immediately east of the railroad tracks and north of the Day Island Bridge Road. This pond was historically the responsibility of the City of Tacoma [prior to the City's incorporation]. The pond discharge is tidally influenced as evidenced by marine growth around the inlet of the twin discharge pipes. *With more frequent cleaning, the pond's sediment removal efficiency can be enhanced. This will require improvement of access road into the pond to facilitate regular maintenance.*
>
> *The pond should also be reconfigured to improve sediment removal and concentrate sediment deposition within in a smaller area in the facility, thereby enhancing discharge quality and maintenance efficiency. The pond should be excavated to remove accumulated sediments and create multiple cells to promote sedimentation.* (Emphasis added.)

[4880-1988-0236]
EXHIBIT 1 .4

Gordon Thomas Honeywell LLP
August 9, 2022
Page 5

It appears that this Project 11 was indeed advanced in some form or another.[3] At the May 2021 meeting, the City provided DYIC a set of October 1999 draft or preliminary drawings by Gray & Osborn, Inc. consulting engineers. The drawings were for pond repairs and appeared to be preliminary, rather than approved designs. But the existence of these preliminary drawings indicates that, regardless of the completeness of the City's maintained records and files, there is a design basis for required maintenance program. Despite that the drawings were intended to depict proposed repair, they still include details of the original pond design, including pond bottom elevations, inlet and outlet pipe inverts. These drawings reveal:

- There was proposed construction of a berm within the pond, which appears to be intended to facilitate pond maintenance by creating a forebay to promote settlement of solids and prevent tidal backflow into the pond. Notably, this berm was observed during the May 19, 2021 site visit.

- The bottom of the pond is designed to be 2 feet below the invert of the 36" concrete outlet pipe (upstream of the twin concrete culverts that discharge into the DIYC lagoon). The apparent purpose of this 2-foot sump is to provide a means for sediment to settle before discharging out of the pond and into the lagoon. Despite this, based on observations of existing site conditions, the bottom of the pond sits approximately at the same elevation as the 36" concrete pipe invert.

Though DIYC is not currently aware of what repair plans were ultimately implemented,[4] the October 1999 preliminary repair drawings evidence that the City (1) accepted responsibility for the Day Island Bridge Pond, and (2) again acknowledged this Pond was in need of repair and maintenance to address sediment buildup. The City brought the plans to the May 2021

---

[3] Documents obtained through public records request reveal that the City completed two Washington Joint Aquatic Resource ("JARPA") Applications to remove silt and sedimentation from this pond. One proposed annual removal of 50 cubic yards of sedimentation over a period of five years. The other JARPA application proposed a one-time removal of 250 cubic yards of sedimentation in August of 1998. Records have not been produced that indicate, one way or another, if any removal of sediments from the pond occurred pursuant to these applications. But the applications again evidence that the City has long understood that maintenance is required to address sediment accumulation in the Day Island Bridge Pond.

[4] The plans that the City provided at the May 19, 2021 meeting  are entitled 27th Street West Detention Pond Repair and are enclosed with this letter. DIYC member Jon Blado submitted a public records request in October 2021 seeking any documents in the City's possession related to those preliminary plans, but the City responded that they found no responsive records. DIYC has since made another more expansive public records request. Documents have been produced in response to that request, but we have yet to ascertain a definitive answer regarding the implementation of the planned repairs.

[4880-1988-0236]
EXHIBIT 1 .5

Gordon Thomas Honeywell LLP
August 9, 2022
Page 6

meeting, evidencing that it clearly remains aware in the present day. Likewise, they admitted at that meeting that, while they do not regularly maintain the Pond, the City does regularly inspect for functionality, evidencing again that the City comprehends on some level that the Pond's functionality impacts the functionality of the City's larger stormwater drainage system.

All of the above information was presented to the City by correspondence from me dated March 4, 2022. Through that correspondence, the DYIC again requested the City to voluntarily acknowledge responsibility for the Day Island Bridge Pond and take prompt action to fully abate and remediate the problem. DIYC also informed the City that it was prepared to meet with the City to discuss a mutually acceptable resolution; but they were prepared to take legal action as necessary to obtain relief from the continuing injuries to DYIC from sediment accumulation in their tidelands. While the March 4 correspondence focused on remedies available under state common law claims, DIYC also reminded the City that it is obligated to repair and maintain the Day Island Bridge Pond under the CWA.

The City responded by correspondence from the City Attorney dated May 12, 2022. Though this time the City did not deny that the Day Island Bridge Pond is part of its larger stormwater management facilities, it once again refused to take action to address this unmaintained Pond. In fact, the City did not even express interest in meeting with DIYC to discuss solutions to the problem.

DIYC remains committed to obtaining relief from the continuing injuries inflicted by the City's refusal to repair and maintain the Day Island Bridge Pond. DIYC has already filed with the City a Tort Claim to put the City on formal notice of its state common law tort claims. This letter is intended to put the City on formal notice of DYIC's intent to commence a citizens' suit under the CWA as a separate avenue to obtain necessary relief.

## VIOLATIONS OF THE CWA

The Clean Water Act makes it unlawful for anyone, including municipalities, to discharge a pollutant into navigable waters except as authorized by specific sections of the Act. 33 U.S.C. § 1311(a) and § 1342. The definition of "pollutant" is broad and includes sediment. 33 U.S.C. § 1362(6); 40 C.F.R. § 122.2; *Driscoll v. Adams,* 181 F,3d 1285, 1291 (11th Cir. 1999). Of course, the principal method of regulating such discharges is the National Pollutant Discharge Elimination System ("NPDES") permitting process. 33 U.S.C. § 1342.

The City was granted coverage for discharges of its collected stormwater under the NPDES Western Washington Phase II Municipal Stormwater permit ("Permit"), issued by the Washington State Department of Ecology effective August 1, 2013. The Permit obligates the City to repair and maintain the Day Island Bridge Pond.

Section S4 of the Permit – Compliance with Standards – requires

Gordon Thomas Honeywell LLP
August 9, 2022
Page 7

      A. In accordance with RCW 90.48.520, the discharge of toxicants to waters of the state of Washington  which would violate any water quality standards, including toxicant standards, sediment criteria and dilution zone criteria is prohibited. ...

      B. The Permit does not authorize a discharge in violation of Washington State Surface Water Quality Standards (chapter 193-201A WAC), Ground Water Quality Standards (chapter 193-200 WAC), Sediment Management Standards (chapter 193-204 WAC), or human health-based criteria in national Toxics Rule (Federal Register, Vol. 57, NO. 246, Dec. 22, 1992, pages 60848-60923). ...

      C. The Permittee shall reduce the discharge of pollutants to the maximum extent practicable (MEP).

      D.  The Permittee shall use all known, available, and reasonable methods to prevent and control pollution of waters of the State of Washington. (Also known as "AKART")

Section S5 of the Permit – Stormwater Management Program (SWMP) – requires the City to adopt and implement a Stormwater Management Program. The City's Phase II NPDES Stormwater Management Program, which was adopted in 2021, sets for the City's Municipal Operations and Maintenance Program at Section 7, which includes maintenance standards for the City's drainage facilities as identified in Appendix B. This SWMP specifically sets maintenance standards for detention ponds within the City's drainage system. Relevant to this matter, the SWMP provides that maintenance is required if accumulated sediment exceeds 10% of the designed pond depth. In such case, the Program requires that sediment be cleaned out to designed pond shape and depth and that the pond be reseeded as necessary to control erosion.

There can be no dispute that the sediment accumulated in the Day Island Bridge Pond exceeds 10% of the designed pond depth. Yet, the City has openly admitted that, for years, it has not performed any maintenance of the Day Island Bridge Pond, much less sediment removal mandated by the SWMP adopted pursuant to the NPDES mandate. As a result, the Day Island Bridge Pond has filled with sediment and debris such that the bottom of the pond is level with the outflow pipe and no longer serves its function as a detention pond for substantial periods. In failing to remove the substantial sediment accumulation in the Day Island Bridge Pond, the City has not only failed to comply with a discrete and specific detention pond maintenance standard in the SWMP, but it has also failed to apply AKART to the City's discharges into the Day Island Lagoon. The end result is increased sediment flow

Gordon Thomas Honeywell LLP
August 9, 2022
Page 8

into the Day Island Lagoon, thereby violating the Permit mandate to reduce the discharge of pollutants – sediments -  to the maximum extent practicable.

The City has violated and continues to violate the terms and conditions of the SWMP and the Permit, including Section S4(A)-(D) and S5, and, thus, has violated the CWA, specifically 33 U.S.C. § 1311(a) and 33 USC § 1342.

## CONCLUSION

The above-described violations reflect those indicated by the information currently available to the DIYC. These violations are ongoing. If appropriate corrective action is not taken in the 60-day notice period, DIYC intends to sue for all violations, including those yet to be uncovered after the date of this notice of intent to sue. DIYC believes that this notice of intent to sue sufficiently states grounds for filing suit.

The above-described violations subject the City, as violator, to civil penalties of up to $59,973 per day per violation and DIYC will seek assessment of such penalties if it commences suit. 33 USC § 1319(d). In addition, DIYC will seek injunctive relief to prevent further violations of the CWA, 33 U.S.C. § 1311 and 33 U.S.C. § 1342, and such other relief permitted by law, including abatement of the significant sediment accumulation in the Day Island Lagoon. Finally, DIYC  will seek litigation costs, including attorneys' fees pursuant to 33 U.S.C. § 1365.

During the 60-day notice period, DIYC is willing to discuss effective remedies for the violations addressed in this letter and settlement terms. If you wish to pursue such discussions in the absence of litigation, we suggest that you initiate those discussions within 10 days of receiving this letter so that a meeting date can be arranged and so that negotiations may be completed promptly. Please be advised the DIYC intends, at the close of the 60-day notice period, or shortly thereafter, to file a citizen suit against the City under 33 U.S.C. § 1365 for violations of the CWA. We do not intend to delay the filing of a complaint if discussions are continuing when the notice period ends.

Very truly yours,

Margaret Y. Archer

cc:     Michael S. Regan, Administrator, U.S. EPA
        Casey Sixkiller, Region 10 Administrator, U.S. EPA
        Laura Watson, Director, Washington State Department of Ecology
        Matt Kaser, University Place City Attorney
        Todd Smith, University Place NPDES Coordinator
        Day Island Yacht Club

[4880-1988-0236]
EXHIBIT 1 .8