1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

7

| | |
|---|---|
| DAY ISLAND YACHT CLUB,<br><br>     Plaintiff,<br><br>  v.<br><br>CITY OF UNIVERSITY PLACE and<br>CITY OF TACOMA,<br><br>     Defendants. | CASE NO. 3:23-cv-5652<br><br>ORDER DENYING MOTIONS FOR<br>SUMMARY JUDGMENT |
| CITY OF TACOMA,<br><br>     Cross-Claimant,<br><br>  v.<br><br>CITY OF UNIVERSITY PLACE,<br><br>     Cross-Defendant. | |

8

9

10

11

12

13

14

15

16

17

18

19

## 1.  INTRODUCTION

20

This Clean Water Act (CWA) citizen suit presents competing summary

21

judgment motions about whether the municipal defendants have violated their

22

obligations in connection with the Day Island Bridge Pond, a waterbody referred to

23

throughout the pleadings as the "Pond." Plaintiff Day Island Yacht Club ("Yacht

Club") alleges that Defendants City of University Place and City of Tacoma failed to maintain the Pond as a stormwater facility, resulting in sediment discharge into navigable waters. Dkt. No. 27 ¶¶ 50–56, 74–83. Tacoma also brings crossclaims against University Place for trespass and public nuisance. Dkt. No. 58 ¶¶ 5–15.

University Place moves for summary judgment on all claims, arguing that the Pond falls outside its federal water discharge permit coverage, that procedural defenses bar the claims, and that res judicata precludes relitigating issues resolved in a 1990 state court action. Dkt. No. 71. Tacoma seeks summary judgment against Yacht Club, contending it has satisfied its permit coordination requirements and that its permit prohibits maintenance activities in natural wetlands. Dkt. No. 68.

The motions turn on contested factual questions about the nature and purpose of the Pond, whether it satisfies the technical criteria for wetland designation, and whether Tacoma's coordination efforts satisfy its permit requirements. While the parties present competing expert opinions and technical evidence on these issues, genuine disputes of material fact preclude resolution on summary judgment. The Court therefore DENIES both motions for summary judgment. Dkt. Nos. 68, 71.

## 2. BACKGROUND

This case has a lengthy factual history, and many parts of the record are in dispute. The Court does not provide a comprehensive statement of facts, but instead recounts background facts relevant to Defendants' motions for summary judgment construed in the light most favorable to Yacht Club.

**2.1    The Pond operates within a cross-boundary drainage system subject to federal permit requirements.**

The Pond[1] is located at the downstream end of the Day Island Waterway Basin ("DIW Basin"), a 480-acre drainage area consisting primarily of residential and commercial development. Dkt. No. 78-2 at 15–16. The Pond, as it exists today, straddles the municipal boundary between Tacoma and University Place, with most of it located on Tacoma-owned property and a smaller portion on University Place land. Dkt. Nos. 70-6; 70-7.

Stormwater and suburban run off from the DIW Basin drains northward through storm sewers, culverts, and detention ponds to a storm sewer that runs along 27th Street West, growing from 24 inches to 36 inches in diameter towards the lower portion of the DIW Basin alongside Day Island Bridge Road and Lemons Beach Road West. Dkt. No. 78-2 at 15–16. Water leaving the Pond discharges through twin 36-inch culverts into the Day Island Lagoon and marina facilities owned by Yacht Club located at 2120 91st Avenue West, University Place ("Marina"). *Id.* at 9, 15–16.

Yacht Club, comprised of around 375 members, provides docking and moorage facilities for its members' boats, and owns both the real property at the Marina and the abutting saltwater tidelands at Day Island Lagoon. Dkt. No. 27 ¶ 13.a–13.b. According to Yacht Club, sediment discharged from the Pond has

---

[1] The parties dispute whether this area is a "pond" or is more accurately characterized as a natural wetland or estuary. Because the Court must view the facts in the light most favorable to the non-moving party on summary judgment, it adopts Plaintiff's nomenclature for purposes of this order without making any legal determination regarding the area's actual nature or classification.

negatively interfered with its moorage operations, boat navigation within its tidelands, and safe use by its members. *Id.* ¶ 14.

Both municipalities operate stormwater systems under federal discharge permits issued by the National Pollutant Discharge Elimination System (NPDES), which is a permitting program under the Clean Water Act. University Place operates under a Phase II Municipal Stormwater NPDES Permit ("UP NPDES Permit") covering small Municipal Separate Storm Sewer Systems, so called "MS4s," while Tacoma operates under a Phase I Municipal Stormwater NPDES Permit ("Tacoma NPDES Permit"). Dkt. No. 27 ¶¶ 11.b., 12.b.

University Place received Phase II permit coverage in January 2007 that required development of a Stormwater Management Program ("SWMP") to establish requirements for its MS4. *Id.* ¶¶ 51, 53. The UP NPDES Permit requires maintenance when accumulated sediment exceeds ten percent of the designed pond depth. *Id.* ¶ 53. Yacht Club alleges that the Pond constitutes a small MS4 under University Place's permit that has exceeded the ten percent sediment threshold, causing increased discharge into Day Island Lagoon. *Id.* ¶¶ 54–56.

As to Tacoma, Yacht Club alleges that Tacoma's Phase I permit requires coordination with University Place to prevent sediment discharge from the cross-boundary Pond area. *Id.* ¶ 81. The parties dispute whether the Pond constitutes part of University Place's regulated MS4 system and what coordination obligations, if any, apply to the Pond.

**2.2    The parties previously litigated stormwater issues in the 1990s.**

This is not the first time the parties have litigated issues related to the Day Island Bridge Pond. In 1990, Yacht Club sued Pierce County and Tacoma in state court, alleging inverse condemnation based on harmful stormwater discharges onto Yacht Club's property. *See Day Island Yacht Club v. Pierce Cnty. City of Tacoma & City of University Place*, No. 90-2-00308-1 (Pierce Cnty. Sup. Ct. 1990). After University Place's incorporation in 1995, Yacht Club added the city as a defendant in the case. Dkt. No. 71 at 4. The suit resolved in January 1997 through an accepted Offer of Judgment that included money damages. Dkt. Nos. 27 ¶ 23 n.1; 71 at 4. As part of the resolution of this lawsuit, the municipalities exchanged correspondence regarding future maintenance responsibilities. University Place's understanding was that "Tacoma has . . . agreed to grant to the City of University Place whatever easements or rights of way are necessary to [construct] a maintenance road for the 27th Street improvements." Dkt. No. 71-5 at 4. However, the parties dispute the scope and duration of any permission granted.

**2.3    The parties dispute the Pond's origins and development.**

The parties dispute the Pond's history. According to Yacht Club, Pierce County installed a 36-inch storm pipe and a settling pond downstream from the Marina in the same area as the Pond in the mid-1980s. Dkt. Nos. 70-23 at 7, 9; 71-7 at 11–13; 80-4 at 2. As a result, Yacht Club witnessed a surge in sediment flow into the Pond area and Day Island Lagoon, which prompted the 1990 litigation. Dkt. No. 71-7 at 11–13.

In 1998, Tacoma and University Place entered an Interlocal Agreement dividing responsibility for maintaining shared rights-of-way with University Place assuming jurisdiction for the entire 27th Street West corridor. Dkt. No. 70-4 at 2. Gary Cooper, University Place's Public Works Superintendent from 1995 to 2022, testified during his deposition that "when you're maintaining the entire right-of-way, that's not only the pavement and the shoulder and the signs but also any storm drain that may be in there," and extended to maintaining the Pond and Lemons Beach Road. Dkt. No. 80-6 at 38–39.

In 1999, University Place contracted with engineers for the "27th Street Detention Pond Repair" and "Stormwater Project—27th Street Detention Pond," involving retrofitting the Pond. Dkt. No. 80-11 at 2–9. The projects included constructing a berm—a raised area of land—in the northern end of the Pond to prevent tidal backflow and excavating soil and sediment below the 36-inch outlet pipe upstream of the pipes that discharge into the Day Island Lagoon. Dkt. Nos. 78-2 at 11; 80-12.

University Place obtained a shoreline substantial development permit (SSDP) for the project in April 2001, Dkt. No. 80-13 at 3–6, and that same month, received approval from the Army Corps of Engineers to go forward without a federal permit after representing that improvements were occurring in an "existing storm pond" to "improve water quality." Dkt. No. 80-14 at 14–16. According to Cooper's testimony, University Place built the project to the specifications prepared by its engineers and retrofitted the Pond. Dkt. No. 80-6 at 78–79.

1

2

3

4

5

University Place and Tacoma dispute this characterization of the Pond. Defendants cite a Washington Department of Ecology determination that the area is a "historic wetland estuary for Day Creek" that "serves no stormwater purpose" and is not a constructed stormwater treatment facility. Dkt. No. 71-6 at 54–56. Yacht Club challenges the admissibility of this "determination."

6

7

## 2.4    Tacoma challenged University Place's maintenance authority in 2019.

8

9

10

11

12

13

14

15

16

17

18

19

In Spring 2019, University Place cut some trees in the Lemons Beach Road and 27th Street right-of-way. Dkt. No. 71-6 at 24. Tacoma Environmental Services Department responded by letter to Cooper requesting that University Place "no longer maintain the section of Lemons Beach Road located within the City of Tacoma limits excluding the maintenance and care associated with the . . . [designated] tree replanting and 3-year maintenance period." *Id.* Cooper replied that University Place remained willing to maintain the area but recommended an on-site meeting to "make sure [they were] all on the same page for the future." Dkt. No. 80-17 at 2. Several months later, in December 2019, Tacoma requested information from University Place about the Pond, but when Cooper sought clarification about what records were needed, Tacoma failed to follow up and no clear agreement between the cities was reached. Dkt. No. 80-6 at 130–31.

20

21

The parties dispute the legal effect these exchanges had on University Place's maintenance obligations and Tacoma's permit compliance.

22

23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**2.5    The current litigation involves federal and state-law claims.**

Yacht Club alleges that both municipalities violated the Clean Water Act by allowing sediment discharge into navigable waters. Against University Place, Yacht Club claims the Pond is part of University Place's MS4 that requires maintenance under its Phase II NPDES permit. Dkt. No. 27 ¶¶ 54–56. Against Tacoma, Yacht Club alleges violations of coordination requirements and direct maintenance obligations under Tacoma's Phase I NPDES permit. *Id*. ¶¶ 75–81.

Yacht Club seeks declaratory judgment, injunctive relief requiring Pond maintenance, civil penalties, and attorney's fees under 33 U.S.C. § 1365(d). *Id*. at 36. Tacoma brings crossclaims against University Place for trespass and public nuisance, alleging University Place "continued to operate the Day Island Bridge Pond as part of its stormwater infrastructure on Tacoma's property for at least twenty-five years from 1995-2019." Dkt. No. 58 ¶ 8.

## 3.    DISCUSSION

### 3.1    Legal standard.

"[S]ummary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020) (citation omitted). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a summary judgment motion, courts must view the evidence "in the light most

favorable to the non-moving party." *Barnes v. Chase Home Fin., LLC*, 934 F.3d 901, 906 (9th Cir. 2019) (internal citation omitted).

## 3.2    University Place's motion for summary judgment against Yacht Club.

University Place advances multiple grounds for summary dismissal,[2] including procedural defenses and a substantive challenge to the scope of its NPDES permit obligations. The Court addresses whether Yacht Club satisfied the Clean Water Act's pre-suit notice requirements, whether it has standing to bring these claims, whether res judicata bars the suit, and finally whether the Pond falls within University Place's regulatory responsibilities. The Court concludes that genuine disputes of material fact preclude summary judgment on the permit coverage issue that forms the heart of this dispute.

### 3.2.1    Yacht Club provided sufficient pre-suit notice to University Place.

University Place argues that Yacht Club failed to comply with the CWA's pre-suit notice requirement under 40 C.F.R. § 135.2(a)(2), which requires service "upon, the head of such agency" for state or local government violators. Dkt. No. 71 at 15–17. University Place contends that because it operates under a council-manager form of government, the City Manager—not the Mayor—serves as the "head of such

---

[2] University Place's motion bears the title "summary judgment" and argues exclusively under Rule 56. Yet the motion also cites Rules 12(b)(1) and 12(b)(6) in its introduction—rules University Place never mentions again. Dkt. No. 71 at 2. The Court will not chase shadows but will instead evaluate the motion for what it is: one for summary judgment.

1  agency," and Yacht Club's failure to serve the City Manager before suing warrants

2  dismissal. *Id.*

3      Yacht Club responds that its notice was legally sufficient under the "overall

4  sufficiency" standard and that service on University Place's Mayor and Public

5  Works Director, who had actual authority over NPDES compliance, satisfied the

6  regulatory purpose. Dkt. No. 82 at 23–26. The Court agrees with Yacht Club.

7      Before private persons and entities may bring citizen suits to enforce the

8  CWA, they "must give a 60-day notice of intent to sue." *Ctr. For Biological Diversity*

9  *v. Marina Point Dev. Co.*, 566 F.3d 794, 800 (9th Cir. 2009) (citing 33 U.S.C.

10  § 1365(a)-(b)). The notice serves two important public purposes: first, it "allows

11  Government agencies to take responsibility for enforcing environmental regulations,

12  thus obviating the need for citizen suits"; and second, it gives the alleged violator an

13  opportunity to comply. *Id.* (quoting *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 29

14  (1989)).

15      "[T]he analysis of whether notice was properly given 'turns on the "overall

16  sufficiency" of the notice.'" *Puget Soundkeeper All. v. Louis Dreyfus Commodities*

17  *LLC*, No. C14-803-RAJ, 2016 WL 7718644, at *4 (W.D. Wash. Mar. 11, 2016)

18  (quoting *Klamath-Siskiyou Wildlands Ctr. V. MacWhorter*, 79 F.3d 645, 651 (9th

19  Cir. 2015)). Courts may look to "both the notice itself and the behavior of its

20  recipients to determine whether they understood or reasonably should have

21  understood the alleged violations." *Cascadia Wildlands v. Scott Timber Co.*, 105

22  F.4th 1144, 1154–55 (9th Cir. 2024) (quoting *Klamath-Siskiyou*, 797 F.3d at 651)).

23

While University Place correctly notes that the City Manager serves as chief executive officer under Washington's council-manager statutes, RCW 35A.13.010, this technical reading ignores the functional reality of NPDES compliance. Yacht Club served notice on Jack Ecklund, University Place's Public Works Director and designated NPDES "responsible official," along with the NPDES Coordinator, Mayor, and City Attorney. Dkt. No. 27 at 39–46; Dkt. No. 82 at 24.

Ecklund possessed actual authority to respond to alleged NPDES violations and immediately did so. Upon receiving the notice, he promptly contacted the Washington Department of Ecology, informed them of University Place's position, and invited a site visit to evaluate the claimed violation. Dkt. Nos. 71-6 at 9–10; 82 at 25. This response shows that the notice reached the person with operational responsibility for the specific regulatory program at issue.

Courts routinely reject arguments that pre-suit notice was insufficient because of service on the wrong person when the recipient receives adequate information to identify the alleged violator and violations. *Waste Action Project v. Draper Valley Holdings LLC*, 49 F. Supp. 3d 799, 814 (W.D. Wash. 2014). For example, in *Draper Valley Holdings,* a court in this District found a pre-suit notice sufficient even though it identified the alleged polluter by the wrong company name because, "[t]aken in the context of the remainder of the notice, defendant could not possibly have been confused about the identity of the alleged polluter" in light of the relevant permit number, location of the polluting facility, and dates on which the violations allegedly occurred. *Id.* at 814.

Like the notice in *Draper Valley Holdings*, the notice given here specified the relevant permits, facility location, and nature of alleged violations. Dkt. No. 27 at 39–46. University Place cannot credibly claim confusion about the identity of the alleged violator, or the substance of the claims given the specificity of the notice and Ecklund's immediate substantive response.

Thus, the Court finds Yacht Club's pre-suit notice legally sufficient.

### 3.2.2    Yacht Club has standing to sue.

University Place argues that Yacht Club lacks standing because it was already compensated for its injuries in the 1990 lawsuit. Specifically, University Place contends that Yacht Club's inverse condemnation covered permanent damage to property and that receiving damages bars Yacht Club's claims based on the same sediment discharge. Thus, according to University Place, Yacht Club has no further injury upon which to base its claims. Dkt. No. 71 at 17–19.

This argument fails because the current lawsuit involves fundamentally different injuries and remedies. In the 1990 lawsuit, Yacht Club claimed that University Place and Tacoma physically harmed, trespassed, and impermissibly took its property. In contrast, the current lawsuit—brought over two decades later—alleges permit violations based on University Place's and Tacoma's failure to maintain the Pond which was retrofitted in 2001 to prevent future sedimentation problems. Indeed, University Place's Public Works Superintendent testified that the Pond was renovated because "we decided that we would go through there and try and make sure . . . there's never a lawsuit again" by creating "a couple of cells so

stormwater has an opportunity to slow down and any particulates settle out." Dkt. No. 80-6 at 23.

Moreover, Clean Water Act remedies serve public rather than private interests. Unlike the 1990 lawsuit seeking monetary compensation for property damage, Clean Water Act citizen suits do not provide damages to prevailing plaintiffs. *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1522 (9th Cir. 1987). Any penalties or benefits from the lawsuit "inure[ ] to the public or to the United States." *Id.* (quoting *Chesapeake Bay Found. v. Bethlehem Steel Corp.*, 608 F. Supp. 440, 449 (D. Md. 1985)). Rather than seeking compensation for past harm, Yacht Club seeks permit compliance and maintenance. Dkt. No. 27 at 36.

Finally, Yacht Club's allegations satisfy Article III standing requirements regardless of the prior litigation. Courts have long held that environmental plaintiffs have pled an injury-in-fact by alleging their use of land have lessened aesthetic and recreational value on account of NPDES permit violations. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.,* 528 U.S. 167, 181 (2000) ("The relevant showing for purposes of Article III standing [in CWA citizen suits], however, is not injury to the environment but injury to the plaintiff."). Yacht Club alleges that sediment discharge from the unmaintained pond interferes with moorage operations, boat navigation, and member use of its marina and tidelands. Dkt. No. 27 ¶ 14. And University Place acknowledges these allegations satisfy Article III requirements. Dkt. No. 71 at 18.

Accordingly, Yacht Club has standing to sue.

### 3.2.3    Res judicata does not bar Yacht Club's current claims.

University Place argues that the 1990 lawsuit involves the same alleged storm system and resulted in final judgment that should preclude Yacht Club's claims under the res judicata doctrine. Dkt. No. 71 at 19. "For the doctrine to apply, a prior judgment must have a concurrence of identity with a subsequent action in (1) subject matter, (2) cause of action, and (3) persons and parties, and (4) the quality of the persons for or against whom the claim is made." *Loveridge v. Fred Meyer, Inc.,* 887 P.2d 898, 900 (Wash. 1995). When these requirements are met, all matters that were litigated or could have been litigated in the prior action cannot support a later action. *Feminist Women's Health Ctr. v. Codispoti*, 63 F.3d 863, 867 (9th Cir. 1995) (quoting *Shoemaker v. Bremerton,* 745 P.2d 858, 860 (Wash. 1987)).

As discussed above, the current lawsuit involves different subject matter and causes of action from the 1990 litigation. While the 1990 lawsuit concerned preexisting conditions and sought property damage compensation, this lawsuit challenges University Place's failure to maintain infrastructure constructed in 2001 to address the problems identified in the prior litigation. It almost goes without saying that res judicata cannot bar claims based on conduct that occurred *after* the prior judgment was entered. *See Collins v. Dep't of Lab. & Indus.,* 259 P.2d 643, 644 (Wash. 1953) (res judicata does not bar claims for aggravation occurring after date of final order).

The distinct legal frameworks and relief sought further distinguish the actions. The 1990 lawsuit sought monetary damages and injunctive relief under state tort law, while this lawsuit seeks regulatory compliance under federal

1   environmental law. Environmental defendants can be held liable for repeating

2   conduct they were previously ordered to cease and remediate. *Kelly v. U.S. E.P.A.*,

3   203 F.3d 519, 522 (7th Cir. 2000).

4        University Place's argument that both lawsuits concern the "same wrongful

5   act" ignores the temporal and legal distinctions. The current claims are based on

6   permit maintenance failures involving infrastructure that did not exist when the

7   1990 lawsuit was resolved, creating genuinely new claims rather than repackaged

8   theories for previously adjudicated harm.

9        ### 3.2.4     Factual disputes preclude summary judgment on the merits.

10       University Place argues that the Pond falls outside its NPDES Permit

11  coverage because it is not a small MS4 under the permit's definitional

12  requirements. University Place contends that an MS4 must be a conveyance system

13  "designed or used for collecting or conveying stormwater" and argues that such

14  systems include only "the infrastructure through which stormwater flows" up to "a

15  discharge point to a receiving waterway." Dkt. No. 71 at 9–10. Under this

16  interpretation, University Place's MS4 includes only the 36-inch storm sewer pipe,

17  not the Pond itself. University Place further argues that the Washington

18  Department of Ecology has characterized the Pond as a historic wetland estuary

19  that "serves no stormwater purpose." *Id*. at 11–12.

20       Contested facts, however, prevent resolution of the MS4 coverage question.

21  The parties present fundamentally different accounts of the Pond's nature and

22  operational history that are essential to determining permit coverage. University

1   Place argues that the area is historically a natural wetland estuary that has never

2   been designed or modified to function as stormwater infrastructure, while Yacht

3   Club contends that University Place deliberately retrofitted the Pond and

4   surrounding area in 2001 to serve as a stormwater Best Management Practice

5   (BMP). Cooper testified that University Place retrofitted the area specifically to

6   "make a couple of cells so stormwater has an opportunity to slow down and any

7   particulates settle out before they can flow through those twin culverts into the

8   . . . bay." Dkt. No. 80-6 at 23–24. Yacht Club also argues that University Place is

9   estopped from denying the Pond's stormwater purpose based on its representations

10  to the Army Corps of Engineers that improvements were occurring in an "existing

11  storm pond" to "improve water quality." Dkt. No. 80-14 at 14.

12        These competing characterizations of intent and function—wetland

13  maintenance versus stormwater infrastructure creation—directly determine

14  whether the regulatory definition of MS4 as a system "designed or used for

15  collecting or conveying stormwater" applies to the Pond. University Place's position

16  requires the Court to accept its factual premise that the Pond is a historically

17  natural feature that hasn't been modified for stormwater purposes, while Yacht

18  Club's evidence of deliberate construction and retrofitting, if credited, could satisfy

19  the MS4 definitional requirements. The Court cannot resolve MS4 coverage without

20  resolving material questions of fact.

21        The Department of Ecology's technical determination does not resolve these

22  factual disputes. While University Place argues that Ecology's conclusion should

23  control, Yacht Club challenges both the reliability and admissibility of the unsigned

internal memorandum. The Court need not rule on the admissibility of the memo now, but even assuming it is admissible, it would carry little weight on summary judgment given the factual disputes about the Pond's construction, purpose, and operation. The determination appears to assess current site conditions rather than analyze the historical evidence of University Place's 2001 retrofitting work or representations to federal agencies about "existing storm pond" improvements. Questions of MS4 coverage require resolving contested facts about facility design and intent that cannot be determined by agency technical opinions focused on present-day conditions. Moreover, Yacht Club has presented evidence that Ecology officials themselves questioned whether the memo constituted an "official determination or final agency action," further undermining its probative value on summary judgment. Dkt. No. 82 at 22–23.

Expert testimony also shows contested factual issues. Yacht Club's expert Chris Carter opines that the Pond constitutes a "legacy BMP" that remains part of University Place's regulated stormwater system despite maintenance deficiencies, concluding that University Place's "failure to maintain the Pond does not meet that NPDES Permit standard." Dkt. No. 78 at 7. Cooper acknowledged that the Pond "was collecting silt, as intended, but now is due for a cleaning as it has reached its limit." Dkt. No. 80-6 at 115.

The Court cannot determine whether the Pond satisfies the regulatory criteria for MS4 coverage without resolving these underlying factual disputes about the Pond's construction, purpose, operation, and current condition. These are issues for trial.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**3.3    University Place's motion to dismiss Tacoma's crossclaims.**

University Place moves for summary judgment on Tacoma's trespass and nuisance crossclaims, arguing that Tacoma disregarded state tort claim filing requirements and that the claims are barred by statutes of limitations. University Place also contends that Tacoma granted permission for the complained-of activities. The Court finds that genuine disputes of material fact preclude summary judgment on these crossclaims.

### 3.3.1    Tacoma substantially complied with the tort claim filing requirement.

University Place argues that Tacoma failed to comply with RCW 4.96.020(4)'s requirement to serve a tort-claim form 60 days before suing, pointing to several alleged compliance failures and arguing that dismissal is mandatory. This argument lacks merit given University Place's own conduct and the substantial compliance standard.

The substantial compliance standard governs claim filing requirements. RCW 4.96.020(5) provides that claim filing requirements "are liberally construed so that substantial compliance will be deemed satisfactory." Courts apply substantial compliance when "the statute has been followed sufficiently so as to carry out the intent for which the statute was adopted." *A.T. v. Everett Sch. Dist.*, 300 F. Supp. 3d 1243, 1253 (W.D. Wash. 2018). The statute's purpose is to provide local governments with "notice of potential tort claims, the identity of the claimant, and general information about the claim." *Renner v. City of Marysville*, 230 P.3d 569, 571 (Wash. 2010)

University Place authorized Tacoma's email filing and cannot now claim noncompliance. During telephone conversations about claim filing procedures, University Place's Risk Manager "expressly invited" Tacoma's counsel to submit the tort claim form by email. Dkt. No. 76 at 10. Tacoma transmitted the claim form on June 11, 2024, at 3:45 p.m., with metadata confirming delivery 31 seconds later. *Id.* University Place's IT Manager acknowledges he cannot dispute the transmission evidence and finds it "plausible" that such an email was sent. Dkt. No. 71-4 ¶ 7. University Place's argument that it never received the email rings hollow when its own authorized agent invited email filing and its IT personnel cannot dispute the transmission evidence.

The Court finds that Tacoma substantially complied with RCW 4.96.020's requirements through authorized email filing that provided University Place with adequate notice and opportunity to investigate the claims.

### 3.3.2    University Place's remaining arguments are doomed by disputed facts.

University Place argues Tacoma's crossclaims are time-barred and should be dismissed based on permission. First, University Place contends the claims accrued in 2001 when it constructed an access road on Tacoma's property to reach the pond area, making those claims time-barred years ago. Alternatively, University Place argues that even if the claims accrued in 2019 when Tacoma requested the University Place cease maintenance activities in the area, the claims would still be time-barred. Second, University Place argues it had Tacoma's permission to perform

the work, which bars both trespass and nuisance claims as a matter of law. Dkt. No. 71 at 24–26.

Tacoma responds that it did not discover the full scope of University Place's modifications until this litigation began, and that any permission was limited to maintenance road construction. Dkt. No. 76 at 14–19. Tacoma argues the statute of limitations does not bar its claims because RCW 4.16.080 "provides a three-year statute of limitations for trespass claims 'after discovery by aggrieved party of the acts or acts from which such liability has arisen or shall arise.'" Dkt. No. 76 at 18–19. But Tacoma misquotes the statute. As University Place points out in its reply, RCW 4.16.080(1) governs the statute of limitation for trespass claims, while Tacoma's quoted language appears in subsection (6), which addresses entirely different causes of action. Dkt. No. 88 at 12 n.8.

Under Washington law, trespass claims must be brought within three years and nuisance claims within two years. RCW 4.16.080(1); *Wallace v. Lewis Cnty.*, 137 P.3d 101, 110 (Wash. 2006). University Place argues the discovery rule is inapplicable to trespass claims, citing *Bradley v. Am. Smelting & Ref. Co.*, 709 P.2d 782 (Wash. 1985). *Bradley* did indeed "reject the discovery rule as being inappropriate for a continuing trespass claim." *Id*. at 693. *Bradley* also recognized the "continuing trespass" doctrine, which affects the statute of limitations analysis. *Id*.

As the Washington Court of Appeals explained, in *Fradkin v. Northshore Util. Dist.*, 977 P.2d 1265, 1267 (Wash. Ct. App. 1999), "[i]f a condition causing damage to land is reasonably abatable, the statute of limitations does not bar an

action for *continuing trespass*. So long as the intrusion continues, the statute of limitation serves only to limit damages to those incurred in the three-year period before the suit was filed." (emphasis added). Whether a claim qualifies as a "continuing trespass" turns on the "reasonable abatability of an intrusive condition." *Id.* at 1270. A trespass is "reasonably abatable" when "[t]he condition . . . can be removed 'without unreasonable hardship and expense.'" *Id.* at 1270 n.25 (quoting *Mangini v. Aerojet–Gen. Corp.*, 912 P.2d 1220, 1225 (Cal. 1996)). "Periodic flooding due to defective construction of a drainage system is a recognized fact pattern in the category of continuing trespass." *Id.* at 1270.

With regard to Tacoma's public nuisance claim, a similar continuing nuisance theory applies. "'A nuisance cause of action accrues when the plaintiff initially suffers from some actual and appreciable harm or when the plaintiff should have discovered the basis for a nuisance action.'" *Raymond Slate v. Pierce Cnty.*, No. 3:14-CV-05161, 2016 WL 410182, at *5 (W.D. Wash. Feb. 3, 2016) (quoting *Wallace v. Lewis Cnty.*, 137 P.3d 101, 110 (Wash. Ct. App. 2006), *as corrected* (Aug. 15, 2006)). But "if the nuisance remains, the plaintiff may continue to collect damages for uncompensated harm until the nuisance is abated." *Id.*

The abatability analysis requires factual development that is absent from the record. In *Skokomish Indian Tribe v. United States*, 410 F.3d 506, 518 (9th Cir. 2005), the Ninth Circuit determined as a matter of law that alleged damages were not reasonably abatable because the tribe's expert provided specific evidence: property valued at $2.17 million would require $3.77 million in remediation costs. The court found this "large discrepancy between the cost of repair and the actual

value of the land" clearly established that "the damages could be abated only with unreasonable hardship and expense." *Id.* Even there, the concurring judge noted that the evidence indicated a factual dispute, distinguishing between costs of repairing consequential property damage versus "the perhaps much lower cost to abate the aggradation itself, by way of dredging or flushing flows." *Id.* at 521–22 (Graber, J., concurring).

Here, the record contains no comparable cost evidence. Cooper testified that the pond was collecting silt as intended but is now due for cleaning, and that University Place had maintenance plans including monitoring and cleaning. Dkt. No. 80-6 at 115–116. But the record contains no expert reports, cost estimates, or other evidence of unreasonable hardship and expense regarding remedial measures. Without such evidence, the Court cannot determine whether remediation would involve "unreasonable hardship and expense."

Genuine factual disputes also exist about the scope of Tacoma's permission. The 1997 letter authorized "a maintenance road" but University Place performed broader pond retrofitting work including berms and excavation. Dkt. Nos. 71-5 at 4; 80-12. The 2019 correspondence further suggests limited or withdrawn permission. Dkt. No. 80-17.

Because genuine disputes exist about both the abatability of any alleged trespass and nuisance conditions and the scope of Tacoma's permission, the Court cannot dismiss the crossclaims as a matter of law.

**3.4    Tacoma's motion for summary judgment against Yacht Club.**

Tacoma argues it is entitled to summary judgment for two reasons. First, Tacoma argues that it has fulfilled its obligation to coordinate with University Place under its NPDES permit by participating in regional stormwater coordination groups. Dkt. No. 68 at 6. Second, Tacoma contends that its permit prohibits construction and maintenance of stormwater treatment facilities within natural wetlands, including the Pond. *Id.* Yacht Club disputes both the adequacy of Tacoma's coordination efforts and the characterization of the Pond as a natural wetland subject to such restrictions.

Contested facts prevent resolution of whether Tacoma's coordination efforts discharged its permit obligations. Tacoma's permit requires coordination mechanisms "among entities covered under a municipal stormwater NPDES permit to encourage coordinated stormwater-related policies, programs, and projects within a watershed." Dkt. No. 70-1 at 15. The permit specifically mandates coordination for "shared waterbodies" and between "physically interconnected MS4s." *Id.* at 15–16. While Tacoma points to its participation in regional working groups and general communications with University Place, Yacht Club argues that meaningful coordination about the Pond specifically was required given the ongoing jurisdictional disputes and shared responsibility for the Pond and surrounding area.

The record reveals genuine disputes about the nature, timing, and adequacy of coordination efforts. Tacoma claims in its crossclaims against University Place that it "was not aware of University Place's 2001 retrofitting or lack of subsequent maintenance," which contradicts any assertion of effective coordination about the

Pond. Dkt. No. 58 ¶¶ 7–8. The extent of coordination—what was discussed, when, with whom, and whether it addressed the Pond specifically—presents factual questions that cannot be resolved on summary judgment. Whether Tacoma's general regional participation constituted adequate coordination for this particular shared "facility" requires examining the specific circumstances at issue.

Similarly, and as noted in the Court's analysis of University Place's motion, whether the Pond qualifies as a wetland exempt from permit requirements depends on contested factual determinations. Tacoma argues that multiple independent experts have concluded the Pond contains wetlands, making maintenance obligations inapplicable under permit restrictions. Dkt. No. 68 at 6. However, Yacht Club's expert Chris Carter challenges this characterization, arguing that "the absence of historical wetlands assessments or delineations, combined with the fact that the Pond and the area around it has been significantly altered by manmade improvements over the past several decades, make it impossible to determine if the Pond lies within or near a natural wetland." Dkt. No. 78 ¶ 23.

The competing expert opinions reflect deeper factual disputes about the Pond's history and current status. Carter argues that because of the "long-standing history of artificial stormwater drainage to this area and surrounding improvements," Tacoma's permit does not prohibit categorizing the Pond as a BMP that requires maintenance. *Id.* ¶ 28. This directly contradicts Tacoma's position that the area constitutes a natural wetland subject to permit restrictions. The parties present strikingly different accounts of whether decades of artificial modifications have transformed what may have been natural wetlands into constructed

stormwater infrastructure. If Yacht Club's allegations are proven at trial—that Tacoma allowed stormwater infrastructure on its property for decades, then prevented maintenance efforts, only to claim environmental immunity when problems arose—such conduct would raise serious concerns about parties invoking environmental protections to avoid responsibility for harm they helped create. But these are contested factual allegations that must be resolved through trial rather than summary adjudication.

Because genuine disputes exist about the adequacy of Tacoma's coordination efforts and the nature of the Pond's wetland characteristics, the Court cannot grant summary judgment in Tacoma's favor.

## 4. CONCLUSION

The Court DENIES Tacoma's motion for summary judgment, Dkt. No. 68. The Court also DENIES University Place's motion for summary judgment against Yacht Club and Tacoma. Dkt. No. 71.

Dated this 22nd day of August, 2025.

Jamal N. Whitehead
United States District Judge